IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-45 |
| | ) | (PHILLIPS/SHIRLEY) |
| WALTER MARTIN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate.  This matter comes before the Court upon the defendant's

Motion to Suppress Evidence [Doc. 12], filed on May 26, 2005.  The parties came before the

Court for a suppression hearing on August 2, 2005.  The government was represented by

Assistant United States Attorney Steven H. Cook, and the defendant was represented by

Attorneys Leslie Hunt and Aubrey Davis.[1]  At the conclusion of the hearing, the Court took the

motion and related filings under advisement.

The defendant is charged [Doc. 1] with being a felon in possession of a firearm on

December 26, 2004.  The defendant contends [Doc. 12] that the police violated his Fourth

---

[1]The Court notes that Mr. Davis is on the training panel to be a Civil Justice Act (CJA)
attorney.

1

Amendment rights in stopping and frisking him on the evening of December 26, 2004, without having reasonable suspicion that a crime was in progress or that he was armed and dangerous. He also argues that any statements he made after being removed from his car on that evening were in violation of the Fifth, Sixth, and Fourteenth Amendments because he was in custody and had not been advised of the Miranda warnings. The defendant asks that all evidence stemming from his stop, frisk, and seizure as well as any statements be suppressed.

The government responds [Doc. 13] that the officer had reasonable suspicion to stop and frisk the defendant while investigating a parking violation and a potential drug crime. It also maintains that the statements the defendant gave after being advised of his Miranda warnings were voluntary.

## I. SUMMARY OF TESTIMONY

At the suppression hearing, the government presented the testimony of Knoxville Police Officer Brian Headrick. Officer Headrick testified that he had served as a patrol officer with the Knoxville Police Department (KPD) for six years, patrolling the south, north, east, and "short west" districts. He said that while patrolling, he often conducted "directed patrols," which were intended to control crime in certain areas.

Officer Headrick testified that on December 26, 2004, he was on duty in the north-east section of Knoxville. He said that the KPD had received numerous citizen complaints as well as information from confidential informants about drug activity at two houses on Oakland Drive–3910 and 4020 Oakland. He described these two residences as known "crack houses" along with another residence around the corner at 4016 Acorn Drive. He said that on

December 26, the KPD had been focusing its manpower on the Oakland Drive area for six months in order to intercept and deter the sale of narcotics. He said that officers also conducted traffic enforcement and talked with people on foot in this area in order to deter drug crimes. He said that during this time, there had been between three hundred and four hundred stops on Oakland Drive. He stated that eighty percent of these stops involved drugs, typically crack cocaine.

Officer Headrick testified that on December 26, 2004, he was on patrol on Oakland Drive. He said that Officer Keith Lyon and Officer Nevin Long were also in the area in separate police cars. He said that at 8:30 p.m., he was parked at a recreation center on Oakland near Acorn. He said that although it was dark out, he could see both 3910 and 4020 Oakland Drive. He said that he would attempt to talk with people approaching the crack houses. He stated that he saw a car travel east on Oakland Drive, turn onto Acorn, and pull into the side driveway of 4020 Oakland Drive. He said there was already a car illegally parked on the road in front of 4020 Oakland in a no-parking area. He described Oakland Drive as a narrow, curvy road and said that it was unsafe to park on the road.

Officer Headrick testified that he walked to the side driveway to talk with the persons who had just arrived. He said that two cars were parked in the driveway. He stated that he walked up to the passenger side window of one car and asked the passenger what he was doing. The passenger said the driver was there to talk to a friend about a job. He said he informed the passenger that the passenger was parked at a crack house. He said that at this point, two other persons came out of the house and a third individual exited the front of the house and began walking toward the illegally parked car. At this time, Officer Lyon arrived. Officer

Headrick testified that he walked up Acorn and then west on Oakland toward the car. He said the suspect walked through the yard to the illegally parked car and got into it. He could not tell if the car was running as he approached.

Officer Headrick testified that when he came within ten to fifteen feet of the car, he shined his flashlight into the car and saw the individual reach down into the floorboard. He said he ordered the person to show his hands, but the person did not comply right away. Headrick said that as he got close to the car, he recognized the occupant as the defendant, Walter Martin, who had been a passenger in a vehicle the officer had stopped months earlier for a traffic violation on Central Avenue Pike and who had been a suspect in several armed robberies involving handguns. Officer Headrick believed that the defendant had been arrested for and convicted of these robberies. He had also been told by a Sheriff's Department employee, that a firearm had been found in the vehicle in which the defendant was a passenger. Officer Headrick testified that he frisked the defendant once he stepped from the car because he knew the defendant to be violent and previously armed and because of the defendant's furtive movements in reaching down into the floorboard and noncompliance with the order to show his hands.

Officer Headrick testified that upon frisking the defendant, he felt an object in the defendant's left front pocket. When he asked the defendant what it was, the defendant responded that if it was hard and metal then it might be a lighter. Headrick removed the object, which turned out to be a .25 caliber handgun. At that point, Headrick said he took the defendant into custody and handcuffed him. A search of the defendant's person revealed a small bag of marijuana. He placed the defendant in his patrol car and helped secure the scene.

Officer Headrick testified said that after securing the scene, he began his arrest

4

report by obtaining biographical information from the defendant. He acknowledged that he did not provide the defendant with the Miranda warnings at this time. Officer Headrick stated that the defendant asked him questions while he was filling out the report and also made some statements. In this regard, he said the defendant asked him if the gun was loaded, but he said that he did not respond. The defendant then said he was going to be "straight" with Headrick and said that he took the gun to a bathroom and unloaded it. The officer denied that he was questioning the defendant at the time the defendant said these things. Officer Headrick testified that after this, he advised the defendant of the Miranda warnings, and the defendant said he understood them.

The officer testified that knowing of other recent armed robberies, he took the defendant to the Safety Building to be photographed and fingerprinted. He said that while awaiting a crime laboratory technician, the defendant told him that the defendant had found the gun in the grass as he walked into 4020 Oakland and had placed it in his pocket to keep a child from getting it. The defendant said that once inside 4020 Oakland, he went to the bathroom, unloaded and reloaded the gun, returned the gun to his pocket, and left the house. Officer Headrick testified that he made no threats and did not coerce the defendant when he was making this statement.

Officer Headrick identified a videotape [Ex. 2] depicting footage taken from his patrol car on December 26, 2004. The videotape bears the starting time of 20:53:15. As the videotape played, Headrick identified the defendant's car and said that vehicles parked within thirty feet of an intersection, which the defendant's car was, obstructed traffic. The videotape shows that a 20:54:28, Headrick walked to the passenger side of a car in the side driveway.

5

From 20:55:36 to about 20:58, the officer talked to the passenger in that car. Officer Headrick

testified that at this point, he saw the defendant exit the residence. He said that Officer Lyon had

arrived by 20:57.

Officer Headrick testified that when he first saw the defendant in the car, he saw

the defendant reaching down. Headrick stated that he recognized the defendant and asked the

defendant who he was there to see. The videotape reveals that at 20:58:19, Headrick told the

defendant to get his hands up.[2] He asked the defendant if he lived there and who he was there to

see. The defendant said he was there to see a friend, and the officer asked the defendant to

identify himself. The defendant replied that he was Walter Martin, and Headrick said he

remembered the defendant. Headrick asked the defendant who he was there to see and,

subsequently, whether he had any fake guns. At 20:58:52, he told the defendant to keep his

hands up. A few seconds later, he asked the defendant, "What's in here?" The defendant asked

if the item was hard and narrow and then opined that it was a lighter. Officer Headrick

announced that he had found a gun at 20:59:25. Headrick testified that he had conducted a Terry

pat-down of the defendant. He said that he felt the gun from the outside of the defendant's

pocket.

The videotape reflects that at 20:59:28, the defendant told Officer Headrick that

he had found the gun on the ground. Headrick asked the defendant to put his hands behind his

back four times. Then, the defendant again stated that he had found the gun on the ground.

Headrick testified that he arrested the defendant for possessing a firearm, escorted the defendant

---

[2]The Court notes that the encounter with the defendant takes place off camera but the
sound is captured on the videotape.

to the patrol car, and searched him, finding marijuana on his person. He said that he placed the defendant in the patrol car. At 21:01:057, the videotape reflects that Headrick told the defendant to sit sideways because he was too big to keep his legs straight. The defendant asked if the officer was taking him to jail. Headrick replied, "Oh, yes. Get in." Officer Headrick testified that there were four or five people outside the residence and that he then helped secure the other suspects.

The videotape shows that at 21:08:34, Officer Headrick activated the "in-car" microphone. He then questioned the defendant about his robbery conviction, for which the defendant replied that he received probation. Headrick asked what conviction the defendant had received, and the defendant replied, "Simple robbery because it was a BB gun." Headrick asked the defendant if he was a convicted felon and then asked for his social security number and driver's license number. At 21:10:50, he questioned the defendant about his address and where he worked. Officer Headrick testified that at 21:11 he was filling out the arrest report and awaiting information from NCIC regarding whether the defendant had any active warrants. The videotape reveals that at 21:12:03, Headrick told the defendant, "This house is too hot. You can't be going in there." The defendant replied that he was visiting his best friend, with whom he had grown up and who lived there. The defendant said he was picking up his friend, who wanted to change clothes. The defendant said that he walked around the side of the hill, and there was a pistol.

The videotape reveals that about 21:12:31, the defendant asked Officer Headrick whether the gun had bullets in it. The defendant then said that he would be "straight" with the officer and that the gun did have bullets in it. The defendant also noted that the gun had a hole in

7

it and asked whether it worked. At 21:13:14, the defendant told Headrick that he did not have

any guns. The videotape shows that at 21:14:53, Officer Headrick advised the defendant of the

<u>Miranda</u> warnings. The officer twice asked the defendant if he understood these warnings, and

the defendant said that he understood. Officer Headrick testified that at this point the defendant

made additional statements but that the defendant only repeated what he had said earlier and did

not say anything new. He said that the defendant also made a statement at the police station.

On cross-examination, Officer Headrick testified that a minimum of three

hundred incidents involving crack cocaine had occurred on Oakland Drive and that he had

personally arrested forty to fifty people on Oakland. He agreed that he knew of no arrests

occurring at 4020 Oakland earlier in the day on December 26, 2004. He said that the area

containing Oakland Drive was a fairly nice community with small, well-maintained older homes

bordered by some new homes.

Officer Headrick denied conducting a <u>Terry</u> pat-down of everyone he stopped at

4020 Oakland Drive. He agreed that he frisked the passenger to whom he was speaking before

he encountered the defendant and described this frisk as "borderline consensual." He said that

he had no prior knowledge of the passenger. He said that weapons were "tools of the trade" of

those trafficking in narcotics and that he saw a lot of weapons in that area. He said that if he was

going to talk with someone for an extended period or if he felt uncomfortable, he would conduct

a <u>Terry</u> frisk.

Officer Headrick agreed that at 20:58:20, the videotape shows him asking the

defendant to put his hands up and asking the def his name. After the defendant identified

himself as Walter Martin, Headrick stated that he knew the defendant and told the defendant that

he wanted to check him for weapons because he knew the defendant to have "fake guns." Officer Headrick testified that when he had turned his flashlight on the defendant, he saw the defendant fumbling around the bottom of the seat of the Honda Passport in which he was sitting. He said that he could not see the defendant's hands but could tell the defendant's arms were moving as the defendant looked at him. The officer said he immediately recognized the defendant as a violent, armed criminal. He said that he asked the defendant about the result of his prior charges because he knew of the charges but was not sure whether the defendant had been convicted. He said that he had not been the first officer on the scene on the state charges. He stated that he had been told that one of the guns used to commit the robberies that were the basis of those charges was a BB gun.

Officer Headrick testified that the defendant was not free to leave when he got out of the car and was frisked. He said that he found the weapon in the defendant's left front jacket pocket. He agreed that he could have found the gun in the defendant's pants but said that he believed it was in the defendant's jacket.

On redirect examination, Officer Headrick testified that during the entire encounter, he never told the defendant that the defendant was free to leave. He said there was a huge difference between someone with their hands down and someone whose hands were on the steering wheel. He stated that if he could have seen the defendant's hands, he would have been less likely to frisk the defendant. He said that when he illuminated the car, he saw the defendant bent over with his hands down. He said he was fifteen feet away from the car at the time. He said he saw movement below the seat and was concerned that the defendant was loading a weapon. He stated that he ordered the defendant to get his hands up and that it took until he got

to the driver's side door before the defendant complied. He said that the defendant then got out of the car without him asking the defendant to do so. With regard to the prior robbery, he said he was told that one real firearm and one BB gun were used.

On recross-examination, Officer Headrick testified that he asked the defendant to identify himself after the defendant stepped out of the car because he wanted to see if the defendant would tell the truth.

## II. FINDINGS OF FACT

The Court finds that around 8:30 p.m., on December 26, 2004, KPD Officer Brian Headrick was conducting a directed patrol of Oakland Drive, an area in which the KPD had made over three hundred stops involving crack cocaine. Officer Headrick parked at a recreation center from which he could observe 4020 Oakland Drive, a known "crack house." He saw a car parked on the street in front of 4020 Oakland and believed this car was illegally parked due to the presence of no-parking signs on the street. While watching the house, he saw another car pull into the side driveway. He approached that car, talked with the passenger, and subsequently frisked him for weapons. While speaking with the passenger, he saw another person leave the front of the house, walk to the car parked on the street, and get into the car.

Officer Headrick walked along Oakland toward the car parked on the street. When he was ten to fifteen feet away, he shined his flashlight on the car and saw a person bending over in the car and making movements near the floor. Headrick ordered that the person get their hands up. The occupant of the car did not comply until Headrick reached the car, by which point Headrick had recognized the individual to be the defendant, whom Headrick knew

10

had been arrested for armed robbery, involving one real firearm and one BB gun.

The defendant stepped out of the car without being asked to do so, and Officer Headrick asked him his name and who he was there to see. The defendant identified himself as Walter Martin and said he was there to see a friend. Headrick asked the defendant if he had any fake guns and patted the defendant down. He felt something in the defendant's pocket, and asked the defendant what it was. The defendant said it was a lighter. Headrick removed the item, which was a .25 caliber handgun. The defendant told the officer that he had found the gun on the ground. As Headrick attempted to get the defendant to place his hands behind his back, the defendant again said he had found the gun on the ground. Headrick handcuffed the defendant and took him to the patrol car. He searched the defendant and found marijuana on his person. As the defendant was being placed in the patrol car, he asked Headrick if he was being taken to jail, to which Headrick replied that he was. After arresting the defendant and securing him in the patrol car, Headrick helped secure the scene.

Approximately six minutes after placing the defendant in the patrol car, Officer Headrick questioned the defendant while filling out the arrest report. In addition to asking the defendant about his social security number, driver's license number, address, and place of employment, Headrick asked him about the nature and outcome of his state charges and whether he was a convicted felon. While awaiting information from NCIC regarding whether the defendant had any outstanding warrants, Headrick remarked that the defendant should not be at 4020 Oakland because it was "too hot." The defendant then stated that his best friend lived at the residence and that when he came to pick his friend up, the friend had wanted to change clothes. The defendant said he walked around the side of the hill and discovered a pistol.

11

Initially, the defendant said that he did not know if the gun contained bullets but then said that he would be "straight" with Headrick and that it did have bullets. The defendant also said that the gun had a hole in it and that he did not have any guns.

About one and one-half minutes after the defendant made this last comment, Officer Headrick read the defendant his <u>Miranda</u> rights. Headrick twice asked the defendant if he understood these rights, and the defendant said that he did. Headrick said that after being taken to the Safety Building for processing, the defendant made additional statements that he found the gun in the grass and put it in his pocket in order to keep a child from getting it and that he had unloaded and reloaded the gun in the bathroom of 4020 Oakland after finding it.

## III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The defendant contends that his rights under the Fourth Amendment were violated because the officer lacked reasonable suspicion (1) to stop him or (2) to frisk him. He also argues that (3) any statements he made after his removal from the car are inadmissible because they were obtained without the defendant being advised of the <u>Miranda</u> warnings. The Court will examine each of these contentions in turn.

### A. Propriety of Stop

The defendant contends that Officer Headrick stopped him as a part of his standard operating procedure, not because the officer had a reasonable suspicion that the defendant was involved in criminal activity. The defendant also disagrees that he was illegally

parked. Thus, he argues that he was illegally seized the moment that Officer Headrick approached him. The government contends that the officer had reasonable suspicion to stop the defendant based upon the parking violation and his being parked in front of a known drug house.

The Knoxville City Code states in pertinent part that "[n]o person shall . . . park a vehicle . . . [a]t any place where official signs or markings prohibit stopping, standing or parking." Knoxville City Code § 17-287(a)(1)(k). Officer Headrick testified that he saw the defendant's vehicle parked illegally on Oakland Drive because there were no-parking signs on the street. Exhibit 1, introduced through Officer Headrick as a map of the relevant portion of Oakland Drive, depicts three no-parking signs on Oakland Drive in the vicinity of the intersection of Acorn Drive, including one sign beside what Officer Headrick testified was the defendant's car.

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d at 392 (citing Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)).

13

In the present case, the Court finds that Officer Headrick had probable cause to believe that the defendant was violating section 17-287(a)(1)(k) of the Knoxville City Code.  He saw the defendant's car parked on the street beside a no-parking sign.  When he saw the defendant exit 4020 Oakland Drive, walk to the car in question, and enter the car, Officer Headrick had probable cause to believe that the defendant was violating the parking restrictions on Oakland Drive and could properly stop him.  See United States v. Burton, 334 F.3d 514, 517 (6th Cir. 2003) (holding that officer had probable cause to stop a car that he had seen parked beside a no-parking sign), cert. denied 540 U.S. 1135 (2004).

Moreover, even if Officer Headrick had not had probable cause to stop the defendant for a parking violation, he could still approach the defendant and attempt to talk with him about his presence at 4020 Oakland Drive.  Not every contact between a police officer and a member of the public is a seizure.  United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990).  A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled.  United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert denied, 474 U.S. 851 (1985).  Nor is there any Fourth Amendment implication before a defendant is even stopped or searched.  United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000).  Accordingly, Officer Headrick could approach the defendant's car and illuminate it with his flashlight without implicating the Fourth Amendment.

Upon illuminating the defendant's car, Officer Headrick saw the defendant bent over, reaching into the floorboard, and the car was not starting.  He ordered the defendant to put his hands up, but the defendant did not comply until Headrick came alongside the driver's side

door.  By this time, Officer Headrick had recognized the defendant as a person who had previously been arrested for armed robbery.  The defendant then got out of the car without Headrick asking him to do so.  Headrick asked the defendant his name and who he was there to see.  The defendant said he was Walter Martin and that he was there to see a friend.  Headrick then asked the defendant if he had any fake guns and proceeded to conduct a <u>Terry</u> frisk of the defendant.

The Court finds that the defendant was seized either when he complied with Headrick's order to place his hands up or, at the very least, when Headrick patted him down.  Although Headrick's initial order for the defendant to get his hands up as Headrick approached the car could have caused the defendant to believe reasonably that he was compelled to comply, the defendant, in fact, did not comply at that time.  The Supreme Court has held that for Fourth Amendment purposes, a seizure does not occur, even if an officer makes a show of authority, when the suspect does not yield.  <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991); <u>see also</u> <u>United States v. Williams</u>, 949 F.2d 220, 222 (6th Cir. 1991).  Accordingly, the Court holds that the earliest point at which the defendant could have been seized was when Headrick came alongside the car and the defendant complied with the order to get his hands up.  At this point, absent the traffic violation discussed above, Officer Headrick had to have had reasonable suspicion to detain the defendant.

An officer may briefly detain an individual on less than probable cause:  "[A] brief investigative stop, or <u>Terry</u> stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure."  <u>United States v. Martin</u>, 289

15

F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations

omitted).  Although an officer may not rely upon a mere hunch to support a Terry stop, "the

likelihood of criminal activity need not rise to the level required for probable cause, and it falls

considerably short of satisfying a preponderance of the evidence standard."  United States v.

Arvizu, 534 U.S. 266, 274 (2002).  Depending upon the circumstances giving rise to the

investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect

while asking a moderate number of questions to identify the suspect and either confirm or dispel

the officer's suspicions.  Martin, 289 F.3d at 396.  If the suspect's answers fail to supply the

officer with probable cause to arrest the suspect, then the officer must release the suspect.  Id. at

397.

The presence of reasonable suspicion is evaluated by examining the totality of the

circumstances surrounding the detention.  See Arvizu, 534 U.S. 266, 273 (2002); Martin, 289

F.3d at 398.  In the present case, Officer Headrick detained the defendant in a car parked on the

street in front of a known crack house.  "The fact that a given locale is well known for criminal

activity will not by *itself* justify a Terry stop; but it is among the various factors that officers may

take into account."  Martin, 289 F.3d at 397; see also Watkins v. City of Southfield, 221 F.3d

883, 888-89 (6th Cir. 2000).  Moreover, the fact that the car was parked on the street rather than

in the driveway indicates that the occupant's stop at the house was of a temporary nature.

Additionally, Officer Headrick saw the defendant bent over, reaching or moving

toward the floorboard, while continuing to look at Headrick.  He also stated that based upon his

experience, guns were "tools of the trade" of those trafficking in narcotics.  In articulating

reasonable suspicion, law enforcement officers may draw upon their "own experience and

specialized training to make inferences from and deductions about the cumulative information available to them," information that may be seemingly innocent to the untrained person. <u>Arvizu</u>, 534 U.S. at 273. Moreover, the Sixth Circuit has held a suspect's reaching into the floorboard of his vehicle contributed to the officer's reasonable suspicion. <u>United States v. Bailey</u>, 302 F.3d 652, 659 (6th Cir. 2002). Finally, the Court finds the fact that the defendant did not immediately comply with Headrick's order to get his hands up supports a finding of reasonable suspicion. Accordingly, the high-crime nature of the location, the way in which the defendant's car was parked, and the defendant's actions when approached by Officer Headrick provided specific and articulable facts for the officer's reasonable suspicion that the defendant was involved in criminal activity. Even if the defendant had not been committing a traffic violation, the Court alternatively finds that Headrick had reasonable suspicion to stop him.

### B. Propriety of Frisk

The defendant next challenges Officer Headrick's frisk of his person after he exited his car. He argues that a parking violation in a suburban neighborhood does not warrant a frisk and that Headrick had no reason to believe that he was armed and dangerous. At the suppression hearing, the defendant pointed to Headrick's earlier frisk of the passenger of the car parked in the side driveway and maintained that it was the officer's policy to frisk everyone whom he encountered at 4020 Oakland Drive. The defendant asserts that this policy of indiscriminate frisking falls short of the specific and articulable facts required before an officer may perform a <u>Terry</u> pat-down. The government argues that Officer Headrick had specific and articulable facts causing him to believe the defendant could be armed and dangerous and that a

frisk was warranted.

An officer may frisk a suspect for weapons in order to assure the officer's safety if a reasonable officer under those circumstances would be justified in believing his or her safety was at risk. Terry, 392 U.S. at 27; United States v. Strahan, 984 F.2d 155, 158 (6th Cir. 1993). This standard also applies when the individual is stopped for a traffic violation, permitting the officer to frisk for weapons if a reasonable person would conclude that the detainee "might be armed and presently dangerous" based upon the circumstances known at the time. Pennsylvania v. Mimms, 434 U.S. 106, 111-112 (1977); see also Michigan v. Long, 463 U.S. 1032, 1048 (1983); United States v. Myers, 102 F.3d 227, 232 (6th Cir. 1996) (holding that it is well-settled that officer may frisk the subject of a traffic stop). "The focus of judicial inquiry is whether the officer reasonably perceived the subject of a frisk as potentially dangerous, not whether he 'had an indication' that the defendant was in fact armed." United States v. Bell, 762 F.2d 495, 500 n.7 (6th Cir. 1985); see also United States v. Thomas, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005) . However,

> the Fourth Amendment does not tolerate, nor has the Supreme Court . . . ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous. The Supreme Court has, in interpreting the Fourth Amendment, struck a balance between the justifiable concern for officer safety when confronting an individual and the substantial individual interest in being free from unreasonable intrusion.

Bennett v. City of Eastpointe, 410 F.3d 810, 841 (6th Cir. 2005).

In the present case, the Court finds that Officer Headrick had a particularized

18

suspicion that the defendant could be armed and dangerous. Initially, the Court notes that the officer was conducting a directed patrol of a crack house after dark. As discussed above, Headrick testified that in his experience, persons trafficking in narcotics were often armed. Although there were two officers on the scene, Headrick was the only officer dealing with the defendant and several other people were outside the residence. Moreover, when the officer first saw the defendant, the defendant was bent over in his car making movements toward the floorboard. Officer Headrick testified that the defendant could have been reaching for or loading a gun. When the officer asked the defendant to raise his hands so that the officer could see them, the defendant did not comply until the officer was alongside the car. Finally, while approaching the car, Headrick recognized the defendant as someone who had been arrested for armed robbery. Although the officer asked the defendant if he had any fake guns immediately before conducting the frisk, Headrick testified that he had been told the prior robbery charges involved a real firearm as well as a BB gun. The Court finds that considering all of these circumstances, Officer Headrick reasonably believed that the defendant was potentially armed and dangerous.

With regard to the defendant's argument that Officer Headrick was frisking everyone with whom he spoke at 4020 Oakland Drive, the Court finds this assertion, even if true, to be unavailing in this case. See United States v. Bencs, 28 F.3d 555, 559 (6th Cir. 1994) (holding that the suppression of evidence turns upon a violation of Constitutional rights or federal law, not upon an agent's violation of internal operating procedures), cert. denied, 513 U.S. 1117 (1995). Notably, the Court questions Headrick's purported practice of frisking persons whenever he has to stand and talk for awhile or whenever he feels uncomfortable because the Supreme Court has directed that a frisk for weapons is permissible only when the

officer reasonably believes the person to be frisked is armed and dangerous.  See  Long, 463 U.S. at 1048; Bennett, 810 F.3d at 835, 841; see also Thomas, No. 04-5872, 2005 WL 1869676 at *2 . Nevertheless, the Court has found that Headrick did have a reasonable belief that Defendant Martin was armed and dangerous based upon the particular circumstances leading up to his frisk. The frisk of Martin was based upon factors–Martin's prior arrest for armed robbery and Martin's furtive movements–not present with the passenger of the car in the side driveway.  Finally, the propriety of the frisk of the passenger is not before the Court.  Accordingly, the Court finds that Headrick's frisk of the defendant was proper.

### C.  Admissibility of Statements

The defendant also contends that the statements he made following being taken into custody when removed from his car are inadmissible because they were made without him being advised of the Miranda warnings.  At the suppression hearing, the defendant acknowledged that the statements he made after being advised of the Miranda warnings are admissible.

The government initially stated in its brief that the statements the defendant made prior to receiving the Miranda warnings are not admissible in its case-in-chief at trial.  However, at the suppression hearing, the government maintained that some of the statements made by the defendant after being taken into custody but before being advised of his rights are admissible because they were volunteered by the defendant and were not made in response to questions from the officer.  It also argued that some of Officer Headrick's pre-Miranda questions only sought biographical information necessary for filling out the arrest report.  It contended that it

20

does not intend to use the defendant's responses to questions about his prior charges and convictions in its case-in-chief at trial. The government also maintains that the defendant's statements given after the <u>Miranda</u> warnings were administered are admissible.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966); <u>see also</u> <u>United States v. Salvo</u>, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994); <u>Salvo</u>, 133 F.3d at 948.

In the present case, the Court sees the defendant's statements as falling into three categories: (1) the statements he made prior to being arrested, (2) the statements he made while detained in the police car following his arrest but before he was advised of his <u>Miranda</u> warnings, and (3) the statements he made following the receipt of his <u>Miranda</u> warnings from Officer Headrick. As neither party questions the admissibility of the third category of statements, the Court will focus its analysis on the first and second categories.

The Court first examines the statements by the defendant in the period leading up to his handcuffing and arrest following Officer Headrick's discovery of the gun. During this time period, the defendant answered Headrick's questions about his identity and who he was there to see. While being frisked, the defendant answered Headrick's question about what was in his pocket by replying that it was a lighter. The defendant also twice stated that he found the gun on the ground as Officer Headrick was in the process of handcuffing him. If the defendant

was not in custody for <u>Miranda</u> purposes during this time frame, then he was not entitled to the

<u>Miranda</u> warnings and the statements he made in the absence of those warnings do not present a

Fifth Amendment violation.

Although persons detained pursuant to a traffic stop are seized within the meaning

of the Fourth Amendment, the dangers inherent in custodial questioning are not present in the

ordinary traffic stop because (1) the person's detention "is presumptively temporary and brief"

and (2) the atmosphere is "substantially less police-dominated" in that the stop occurs in public

and the person is typically confronted by only one or two officers. <u>Berkemer v. McCarty</u>, 468

U.S. 420, 4336-39 (1984). In this respect, the Supreme Court has deemed a traffic stop to be

more analogous to an investigatory stop than a formal arrest. <u>Id.</u> at 439. On the other hand, "[i]f

a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment

that renders him "in custody" for practical purposes, he will be entitled to the full panoply of

protections prescribed by <u>Miranda</u>." <u>Id.</u> at 440.

With respect to investigatory detentions,

> [t]he very nature of a <u>Terry</u> stop means that a
> detainee is not free to leave during the
> investigation, yet is not entitled to <u>Miranda</u> rights.
> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439-41 . . .
> (1984). Therefore, the pertinent question is whether
> [the defendant] was "in custody" during the
> investigatory detention for the purposes of
> determining whether his Fifth Amendment rights
> were violated.

<u>United States v. Swanson</u>, 341 F.3d 524, 528 (6th Cir. 2003). The "ultimate inquiry is simply

whether there is a formal arrest or restraint on freedom of movement of the degree associated

with a formal arrest." <u>Id.</u> (quoting <u>United States v. Knox</u>, 839 F.2d 285, 291 (6th Cir.1988)).

The defendant asserts that he was in custody for <u>Miranda</u> purposes immediately upon being removed from his car. The Court disagrees with this assertion. First, the Court notes that the defendant was not ordered out of the car or removed from it by Officer Headrick but, instead, exited the car of his own volition. The defendant answered a couple of questions about his identity and why he was at 4020 Oakland Drive before Officer Headrick proceeded to frisk him for weapons. The Court finds that these questions were incidental to the traffic stop or <u>Terry</u> detention and that the defendant was not in custody at this time. Additionally, the defendant answered Headrick's question about what was in his pocket during the <u>Terry</u> frisk. A frisk for weapons is not the equivalent of a restraint of freedom tantamount to a formal arrest. The Court also finds that the defendant was not in custody at that point.

The defendant's next two statements that he found the gun on the ground are more problematic because they occurred after the defendant had been frisked and the gun discovered and while Officer Headrick was attempting to handcuff the defendant. Although it is a factor to consider, the use of handcuffs does not automatically convert an investigatory detention into an arrest. <u>See</u> <u>Houston v. Clark County Sheriff Deputy John Does 1-5</u>, 174 F.3d 809, 815 (6th Cir. 1999) (holding that handcuffing a suspect does not "exceed the bounds of a <u>Terry</u> stop, so long as the circumstances warrant that precaution"). On the other hand, Officer Headrick had already retrieved the weapon from the defendant, thereby alleviating some of the officer's safety concerns. Additionally, Headrick testified that he arrested the defendant at this time and took him back to the patrol car. As the defendant was getting into the police car, the videotape reflects that Headrick confirmed that the defendant was going to jail.

Like handcuffing, "[d]etention in a police car does not automatically constitute an

23

arrest." United States v. Bradshaw, 102 F.3d 204, 211 (6th Cir. 1996). On the other hand,

moving a defendant from the location of the stop to a police car indicates that the defendant has

been arrested. See United States v. Butler, 223 F.3d 368, 375 (6th Cir. 2000) (observing that

"officers cross the line from an investigatory stop into an arrest when they place a suspect in a

police vehicle for questioning"); United States v. Richardson, 949 F.2d 851, 857 (6th Cir. 1991).

In this case, the Court finds that the placing of handcuffs on the defendant was a restraint on his

movement to the degree associated with a formal arrest, which the Court finds occurred

immediately thereafter. The combination of being handcuffed, being moved from his car to the

officer's patrol car, and being detained therein is tantamount to a formal arrest in this case.

Thus, the defendant was in custody for Miranda purposes when he was handcuffed and

subsequently placed in the patrol car.

Although the defendant was in custody or in the process of being taken into

custody at the time he made the two exclamations that he found the gun on the ground, the Court

finds that these statements were not made in response to interrogation. "Volunteered statements

of any kind are not barred by the Fifth Amendment." Miranda, 384 U.S. at 478. The Supreme

Court has defined interrogation for purposes of Miranda as follows:

> [T]he Miranda safeguards come into play whenever
> a person in custody is subjected to either express
> questioning or its functional equivalent. That is to
> say, the term "interrogation" under Miranda refers
> not only to express questioning, but also to any
> words or actions on the part of the police (other
> than those normally attendant to arrest and custody)
> that the police should know are reasonably likely to
> elicit an incriminating response from the suspect.

Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980) (footnote omitted); United States v. Murphy,

107 F.3d 1199, 1204 (6th Cir. 1997).  The Court finds that Officer Headrick did not expressly

question the defendant nor say or do anything that he should have known was reasonably likely

to cause the defendant to state that he found the gun in the grass.  Accordingly, the Court finds

that these two statements were volunteered by the defendant and not subject to the <u>Miranda</u>

warnings.

The Court next examines the second category of statements–those made after the

defendant was detained in the police car but before he was given the <u>Miranda</u> warnings.  The

government argues that the statements by the defendant during this time were either in response

to the officer's request for biographical information in order to fill out the arrest report or were

volunteered.  Officer Headrick testified that after securing the scene, he returned to his patrol car

an began filling out his arrest report by obtaining biographical information from the defendant.

The videotape reveals that Headrick asked the defendant about his robbery conviction, asked

whether the defendant was a convicted felon, asked for the defendant's social security number

and driver's license number, and asked about his address and place of employment.

<u>Miranda</u> does not apply to routine biographical information necessary for

"'booking or pretrial services.'"  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 600 (1990) (quoting

<u>United States v. Horton</u>, 873 F.2d 180, 181 n.2 (8th Cir. 1989)).  Likewise, the Sixth Circuit has

"consistently held that routine biographical information elicited during the booking process does

not constitute interrogation under a Fifth Amendment <u>Miranda</u>-rights analysis."  <u>United States v.</u>

<u>Godinez</u>, 114 F.3d 583, 589 (6th Cir. 1997) (holding that a personal history questionnaire taken

by a deputy marshal during booking did not violate the Fifth Amendment).  Such exemption

from <u>Miranda</u> is only appropriate in the absence of evidence that law enforcement used the

booking procedures to illicit incriminating information.  <u>United States v. Broadus</u>, 7 F.3d 460, 464 (6th Cir. 1993); <u>United States v. Clark</u>, 982 F.2d 965, 968 (6th Cir. 1993).

The Court finds that the questions and resulting statements relating to the defendant's social security number, driver's license number, address, and place of employment properly fall within this "booking exception."  The Court questions whether Headrick's asking about the robbery conviction was not intended to illicit an incriminating response (that the defendant was a convicted felon) in light of the discovery of the gun on the defendant's person.  Nevertheless, the government has stated that it does not intend to use the defendant's responses relating to his prior convictions in their case-in-chief at trial.  As such, the Court finds that the government has agreed to their exclusion without the necessity of finding that they violate the Fifth Amendment.

Finally, the Court turns to the defendant's statements following Officer Headrick's comment that the defendant should not be at 4020 Oakland because it was "too hot."  This comment was made while the defendant was handcuffed and seated in the patrol car and during the time the officer was filling out the arrest report and waiting on the results of a records check on the defendant.  After this comment the defendant stated that he was visiting a friend with whom he had grown up.  The defendant said that he arrived to pick up this friend, who wanted to change clothes.  The defendant stated that he walked around the side of the hill and found a pistol.  About thirty seconds after Headrick's comment, the defendant asked Headrick if the gun contained bullets.  Without receiving a reply, the defendant then said he would be "straight" with the officer and that the gun did contain bullets.  He also observed that the gun had a hole in it and asked whether it worked.  Again without receiving a response from Headrick, he

told the officer that he did not have any guns.  About one and one-half minutes later, Headrick advised the defendant of the <u>Miranda</u> warnings.

The Court has already found that the defendant was in custody at this time.  The central issue with regard to these statements by the defendant is whether they were in response to interrogation by Officer Headrick.  As discussed above, interrogation under <u>Miranda</u> extends to the functional equivalent of questioning, that is words or actions that the officer "should know are reasonably likely to elicit an incriminating response from the suspect."  <u>Innis</u>, 446 U.S. at 301 (footnote omitted).  This type of interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police."  <u>Id.</u>

In <u>Innis</u>, the Court held that the defendant was not interrogated for purposes of <u>Miranda</u>.  <u>Id.</u>  There, the defendant had been arrested for shooting a taxicab driver with a shotgun, been given the <u>Miranda</u> warnings, and declined to make any statements without a lawyer present.  Officers transporting the defendant to the police station had a conversation among themselves regarding the danger to children of a nearby school for the handicapped if they found the shotgun.  Immediately after these comments, the defendant directed the officers to turn around and said he would show them the location of the shotgun.  The Court held that the officers had not expressly questioned the defendant, nor had they subjected him to the functional equivalent of questioning.  <u>Id.</u> at 302.  It concluded that nothing in the record indicated that the officers should have known that their dialog was reasonably likely to cause the defendant to give an incriminating response.  <u>Id.</u>  Nothing suggested that the defendant "was particularly susceptible to an appeal to his conscience regarding the safety of handicapped children.  Nor is there anything in the record to suggest that the police knew that the respondent was unusually

disoriented or upset at the time of his arrest." Id. at 302-03.

In the present case, Officer Headrick did not ask any questions immediately before the defendant made the statements about why he was at the residence, finding the gun, or whether the gun was loaded and functional. Instead, Officer Headrick merely remarked that the defendant should not have been at the residence because of the nature of the activity that goes on there. First, the Court notes that the comment was a single remark and not a "lengthy harangue in the presence of the suspect." Id. at 303. Second, there is no indication that Headrick was seeking to illicit incriminating information from the defendant. Headrick's comment was not "particularly evocative." Id. (internal quotations omitted). Moreover, much of the information that the defendant disclosed following the comment, he had already told Headrick earlier in the evening. The defendant told the officer why he was at the residence–to visit a friend–at the onset of the stop, and after Headrick discovered the gun on the defendant's person, the defendant twice exclaimed that he had found the gun. Third, nothing in the record indicates that Headrick should have known that his comment about the house would have caused the defendant to repeat why he was there and that he found the gun or to reveal that he knew the gun was loaded.

The First Circuit has reasoned that the brevity and non-confrontational nature of an officer's comment are important factors in evaluating whether the comment is the functional equivalent of interrogation. See United States v. Genao, 281 F.3d 305, 311 (1st Cir. 2002). In Genao, officers searched, pursuant to a warrant, the defendant's apartment as well as the vacant apartment above for which the defendant was acting as the landlord. Id. at 307-08. One officer showed the defendant heroin, paraphernalia, and handguns seized from the vacant apartment and said, "We've got a problem here." Id. at 308. The defendant immediately confessed that the

28

items were his and that he did not want his wife to get in trouble.  Id.  The defendant

subsequently argued that the officers comment was the functional equivalent of interrogation.

Id. at 310.  The court disagreed, finding that the officer's remark was a preliminary comment

made to get the defendant's attention before advising him of the Miranda rights and that he was

under arrest.  Id. at 311.  Additionally, the First Circuit held that "the remark was brief, was not

worded in a particularly confrontational manner, and did not directly accuse [the defendant] of

any crime or seek to inflame his conscience."  Id.  Similarly, in the present case, Officer

Headrick's comment was brief, not confrontational, and did not amount to a direct accusation of

a crime.  Nor did Headrick's comment constitute an attempt to inflame the defendant's

conscience.  Moreover, in the present case, the comment was not accompanied by a display of

incriminating evidence that the officer had seized.  Accordingly, the Court finds Headrick's

comment to be more innocuous than either the conversations in Innis or the remark in Genao.

   After carefully considering Headrick's comment regarding the residence, the

Court finds that it did not impose "a measure of compulsion above and beyond that inherent in

custody itself."  Id. at 300.  Accordingly, the Court finds that Headrick's comment about the

house was not the functional equivalent of interrogation.  Instead, like in Innis, it was merely an

"offhand remark[]" by Officer Headrick.  Id. at 302.  Thus, the subsequent statements by the

defendant were also volunteered and are not subject to suppression due to the absence of the

Miranda warnings.

## IV. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion

to Suppress Evidence [**Doc. 12**] be **DENIED**.[3]

Respectfully submitted,


   s/ C. Clifford Shirley, Jr.   
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be served and filed within ten
(10) days after service of a copy of this recommended disposition on the objecting party. Failure
to file objections within the time specified waives the right to appeal the District Court's order.
Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where
objections to this report and recommendation are frivolous, conclusive, or general. Mira v.
Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate
review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).